**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KATHLEEN CAVALARO,<br><br>Plaintiff<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et. al,<br><br>Defendants | Case No.: 2:25-cv-02234-APG-MDC<br><br>**Order (1) Granting in Part Plaintiff's Motion for Preliminary Injunction and (2) Denying as Moot Plaintiff's Motion for Temporary Restraining Order**<br><br>[ECF Nos. 62, 65] |

On June 11, 2025, hundreds of protestors gathered near the Fremont Street Experience in Las Vegas to protest Immigration and Customs Enforcement (ICE) policies. Eventually, the crowd became unruly and difficult to control. The Las Vegas Metropolitan Police Department (Metro) declared an unlawful assembly. After reading the dispersal order several times, Metro officers began arresting protestors for failure to disperse. To control the crowd and encourage dispersion, at times they also used pepperballs, a non-lethal munition that releases an aerosol irritant upon explosion.

Over an hour after the first dispersal order, Kathleen Cavalaro arrived at the protest. Alone and carrying a sign, she approached a skirmish line of uniformed Metro officers while shouting insults at them. An officer pointed behind her, telling her to "go that way." She complied, turning to walk away from officers while continuing to shout insults over her shoulder. Officers began to follow her even though she followed their command to "go that way," and a Metro officer shot Cavalaro in the back with a pepperball. Cavalaro asserts she was also shot in the side. Officers also sprayed dozens of pepperballs at the ground near her feet as she walked away from them. As Cavalaro hid behind her sign to shield herself from the barrage of

pepperballs, officers followed her, took her to the ground, and arrested her for failure to disperse and provoking a breach of peace. No charges were ever brought against Cavalaro.

Cavalaro sues Metro, the City of Las Vegas, several Metro officers in their individual capacities, and a Las Vegas corrections officer, asserting ten constitutional and statutory claims and requesting monetary damages and injunctive relief. The City of Las Vegas and the corrections officer settled the claims against them and have been dismissed.

Cavalaro now moves for two separate preliminary injunctions, each tied to a different claim. For her claim of First Amendment retaliation, she requests an injunction mandating Metro to designate and communicate a specific dispersal area whenever it declares an unlawful assembly and prohibiting Metro officers from arresting protestors outside that area. As to her claim of excessive force, she requests an injunction prohibiting Metro from deploying pepperballs against protestors unless they present a risk of harm to officers or are engaged in serious unlawful activity. Metro responds that Cavalaro cannot show a likelihood of success on either claim, she cannot show a likelihood of irreparable harm, and the balance of the equities and public interest weigh in its favor.

I grant Cavalaro's motion in part. I deny her motion for a dispersal order injunction. I grant in part her motion for a pepperball injunction but narrow the scope from what she requests.

## I. Background

Just after 4:00 p.m. on June 11, 2025, a small group of protestors gathered on South Las Vegas Boulevard to protest ICE immigration policies. ECF No. 62-2 at 2. The protest grew to include hundreds of protestors demonstrating and marching on both sides of the street and

drawing a police presence. ECF No. 65-4 at 00:15:20.[1] Eventually, some protestors began blocking roadways and fighting each other, leading Metro officers to declare an unlawful assembly. ECF Nos. 34-2 at 3; 62-2 at 12–14. A Metro officer read substantially similar versions of the following dispersal order from a vehicle-mounted loudspeaker five separate times between 8:34 p.m. and 9:07 p.m.:

> This is the Las Vegas Metropolitan Police Department. You have committed an unlawful act. This gathering has been declared an unlawful assembly by Nevada Revised Statutes 203.020. The statute requires you to disperse immediately upon this order. You can disperse by traveling east on Clark. If you fail to disperse, you will be subject to police action which may include the use of force and tear gas. This will cause pain and discomfort. Failure to disperse will result in arrest.

ECF Nos. 34 at 6; 65-9 at 00:01:25; 65-10 at 00:00:03.

Thirty minutes after the final dispersal order, armored Metro SWAT officers, following an armored vehicle, shot the first pepperballs of the night at protestors who remained at the intersection of Clark Street and 6th Street, just east of Las Vegas Boulevard. ECF Nos. 65-5 at 00:13:35; 65-22 at 3–4. They secured the intersection in under a minute. ECF No. 65-5 at 14:30. The armored SWAT officers followed the dispersing protestors to ensure they dispersed further. ECF No. 65-22 at 4. The SWAT officers then moved to a skirmish line of patrol officers at the intersection of Fremont Street and Las Vegas Boulevard and determined that "the protestors were obviously not following the lawful orders to disperse," as they remained on Fremont Street yelling at officers. *Id.* Officers fired pepperballs at the ground and directly at some protestors, hitting several, as the protestors returned fire by throwing rocks and other objects. *Id.*

---

[1] I cite to manually filed video evidence by its docket number and the approximate run time on the video, rather than the Metro timestamp depicted on the video itself.

Around the same time, SWAT officers arrived at a different cross-street where protestors had gathered near another Metro skirmish line. ECF No. 65-20 at 00:00:25. Officers shot over 30 pepperballs at the ground near protestors, but sometimes hit protestors directly. *Id.* at 00:00:45. As a photographer knelt to capture a photo of the scene, one officer stated "get a little bit of this here" and shot numerous pepperballs at the ground near him, then shot the photographer directly in the back as he retreated. *Id.*; ECF No. 65-24 at 00:00:02. This contravened Metro's use of force policy at the time, which stated: "[i]n situations where a threat of harm exists and orders to disperse have been given, aerosol irritants may be used to assist in the dispersal of the crowd when individuals pose a threat of harm to officers or another person[.]" *Downes-Covington v. Las Vegas Metropolitan Police Dep't*, 2:20-cv-01790, ECF No. 26 at 34. Officers then advanced their skirmish line toward the protestors, continuing to push them back by firing pepperballs at the ground. ECF No. 65-20 at 00:01:15.

Officers arrested dispersing protesters, noting in radio communications that "they [the protestors] are starting to disperse in different directions again from Stewart and 8th [streets]," and "every time [officers] get close to a group, they disperse and run." ECF No. 65-25 at 00:00:36, 00:01:03. Officers in marked police cars with emergency lights flashing pursued small groups of protestors, as they received radio instruction that they "can just start grabbing people up." *Id.* at 00:03:10. One officer immediately responded via radio: "Copy. That's happening, we're making arrests now as we speak." *Id.* at 00:03:18. A few seconds later, the next radio communication instructed: "All units on channel, we are in mass arrest mode. Form strike teams. Make mass arrests, if you haven't already been assigned to a skirmish line." *Id.* at 00:03:24. Metro's second-in command, Undersheriff Walsh, would later testify that a "dispersal order tells the crowd that the protest is over," regardless of location. ECF No. 65-26 at 2. When

asked how far protestors must disperse to avoid arrest, he answered: "[g]reat question. I don't know the answer to that." ECF No. 65-29 at 3.

Kathleen Cavalaro arrived at the protest just after 10:00 p.m., long after Metro announced the dispersal orders and began making arrests. ECF No. 65-1 at 2. During a relatively calm moment, she approached a skirmish line of armored officers. ECF No. 65-5 at 00:48:03. She was alone carrying a protest sign. *Id.* at 00:48:10. An officer met her on the sidewalk, pointed a pepperball gun at her, gestured behind her, and instructed her: "Hey! Hey! Hey! Go that way. Go that way." *Id.* at 00:48:15.

Cavalaro immediately did as instructed, walking away from the skirmish line while turning her upper body back toward the officers to repeatedly yell "fucking fascists!" and film them on her cell phone. *Id.* at 00:48:17. After a few steps, she stopped yelling, put her phone down, turned her upper body away from officers, and continued walking away from the officers as she was told. *Id.* at 00:48:26. Officers then began shooting pepperballs at Cavalaro, hitting her in the back with at least one pepperball,[2] and shooting numerous pepperballs at the ground near her. *Id.* at 00:48:34. As she continued retreating, shielding herself from the barrage with her protest sign, several officers followed her down the sidewalk while continuing to shoot pepperballs at her. *Id.* at 00:48:40. Eventually, officers took Cavalaro to the ground. *Id.* at 00:49:03. They ziptied her hands behind her back, arrested her for failure to disperse and provoking a breach of peace, and booked her into jail. *Id.* at 00:49:20; ECF No. 65-37 at 2.

Cavalaro states in an affidavit that, as a result of this experience, she is "terrified to take part in other public protests." ECF No. 65-1 at 3. She wishes to participate in other protests

---

[2] Metro disputes that the shot to her back was intentional. I have reviewed the videotape and I find she is likely to succeed in showing that the shot was intentional, retaliatory, and excessive.

leading up to the November 2026 midterm elections but is “still full of anxiety and fear of being falsely arrested again, being shot with pepperballs or worse.” *Id.* She states that she has “attempted to put on a brave face and participate in protests. However, [she has] not been able to fully participate, [has] sometimes left at the very beginning of the protest[,] and once was able to stay for a while, but [her] anxiety overcame [her] and [she] had to leave early.” *Id.* at 4.

To remedy this injury, she asks me to issue the following preliminary injunctions prohibiting Metro from:

> Enforcing dispersal orders outside of the specific area that LVMPD communicates that the protesters must leave, after protesters comply with the plain meaning of the dispersal order [the dispersal order injunction]; and
>
> Shooting pepperballs at any individual without evidence of a physical threat to an officer or other individual, or that the targeted individual is engaged in serious criminal behavior [the pepperball injunction].

ECF No. 65 at 48.

## II. Analysis

First, I must determine whether Cavalaro has standing to challenge the complained-of actions. I must then determine whether she is entitled to a preliminary injunction. If so, I must determine the appropriate scope of relief.

Cavalaro has standing to seek both injunctions, but I cannot enter the ones she requests. I deny her request for the dispersal order injunction because she has not met her burden to show entitlement to a mandatory injunction, the injunction she requests is too broad, and it is not sufficiently tied to the First Amendment violation she asserts. I grant a more limited version of the pepperball injunction because she demonstrates that she is likely to succeed on the merits, will be irreparably harmed in the absence of injunctive relief, and the balance of the equities and

public interest weigh in her favor. However, I narrow the scope of her relief because I may not constitutionally grant what she requests.

A. Cavalaro has standing to challenge both Metro's dispersal order and its pepperball usage.

"Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (simplified). "A suit brought by a plaintiff without Article III standing is not a case or controversy, and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) (simplified). The "irreducible constitutional minimum" of Article III standing consists of three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quotation omitted). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* I evaluate Article III standing by considering the facts as they existed at the time the plaintiff filed the complaint. *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992)).

Metro argues that Cavalaro lacks standing because "past exposure to allegedly unlawful conduct, standing alone, creates no case or controversy for forward-looking relief." ECF No. 75 at 8. Cavalaro responds that Metro's characterization is inaccurate. Rather, she alleges "a present, ongoing curtailment of her own First Amendment activity that persists to this day. She does not allege she might be chilled; she alleges that she is chilled right now, that she attends protests less often, leaves early, and sometimes cannot make herself stay at all." ECF No. 83 at 30.

Metro cites three cases, each of which denied standing for injunctive relief where a plaintiff suffered a completed past harm and alleged a speculative risk of future harm stemming from it. In *O'Shea v. Littleton*, a class of plaintiffs claimed they had been subjected to discrimination in various respects, such as a county magistrate sentencing members of the plaintiffs' class more harshly than other defendants. 414 U.S. 488, 491–92 (1974). The Supreme Court denied standing because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 495–496. In *City of Los Angeles v. Lyons*, the Court denied standing for an injunction to a plaintiff who claimed that local law enforcement had subjected him to an unlawful chokehold. 461 U.S. 95, 97–98 (1983). Because the plaintiff suffered no present, ongoing effects from the maneuver, he was "no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* at 111. And similarly, in *Hodgers-Durgin v. de la Vina*, the plaintiffs alleged that they were each stopped by Border Patrol agents in violation of the Fourth Amendment. 199 F.3d 1037, 1038–39 (9th Cir. 1999). The Ninth Circuit assumed that an Article III case or controversy existed, but nevertheless held that the plaintiffs lacked standing "because of the second, alternative ground advanced in *Lyons*," that of "irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff[s] will be wronged again." *Id.* at 1042 (quotations omitted).

But none of these cases alleged a present, ongoing harm. Indeed, *O'Shea* itself noted that the plaintiffs may have satisfied the inquiry if they had alleged "continuing, present adverse effects." 414 U.S. at 495–96. More recently, the Ninth Circuit in *Villa v. Maricopa County* noted

that a plaintiff may satisfy Article III by showing either "continuing, present adverse effects" or a sufficient likelihood that she will "again be wronged in a similar way." 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *id.*; *Lyons*, 461 U.S. at 111). Cavalaro does the former and also alleges that Metro's policies show they are likely to wrong her again.

In *Index Newspapers LLC v. United States Marshals Service*, a group of journalists sued the City of Portland for injunctive relief stemming from alleged constitutional rights violations. 977 F.3d 817, 821–22 (9th Cir. 2020). They alleged that during a large Black Lives Matter protest, "the local authorities shot them with less-lethal munitions (pepper balls, impact munitions, paint markers, and tear gas canisters), and pepper sprayed, shoved, and otherwise prevented them from recording and reporting on the protests and on law enforcement's response to the same." *Id.* The district court granted their requested injunctive relief. *Id.* at 823–34. On appeal, the government defendants argued that the plaintiffs lacked standing, raising the same *Lyons* arguments as here. *Id.* at 825.

The Ninth Circuit held that the plaintiffs had standing because the nature of their injuries "sharply differs from the substantive due process injury asserted in *Lyons*."[3] The plaintiffs

---

[3] The Ninth Circuit also found significant that "the district court found that the Federal Defendants had engaged in a pattern of conduct that had persisted for weeks and was ongoing." *Id.* at 826. The court found this reasoning "compelling because 'the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented.'" *Id.* (quoting *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 507 (9th Cir. 1992)). The Ninth Circuit relied largely on the fact that "[u]nlike *Lyons*, the district court found that some journalists and legal observers monitoring the protests had been injured by the Federal Defendants more than once." *Index*, 977 F.3d at 826.

Here, there are repeated, documented incidents of excessive force, both before and during this particular protest. In *Downes-Covington v. Las Vegas Metro. Police Dep't*, No. 2:20-cv-01790, 2020 WL 7408725, at *9 (D. Nev. Dec. 17, 2020), this court found that, during a 2020 protest, Metro's use of force "appear[ed] unreasonable" where officers shot pepperballs at the feet of compliant and retreating protestors who were walking away from officers, some with hands raised, as ordered by officers. Similarly, several instances of excessive force likely existed

alleged that officers' crowd-control measures "'chilled' the exercise of their First Amendment rights, and that this First Amendment injury was ongoing. A chilling of First Amendment rights can constitute a cognizable injury, so long as the chilling effect is not 'based on a fear of future injury that itself [is] too speculative to confer standing.'" *Id.* (quoting *Munns v. Kerry*, 782 F.3d 402, 410 (9th Cir. 2015)). Thus, so as long as Cavalaro's chilled speech is not based on an overly speculative fear, she has standing here.

In considering whether conduct is likely to occur in the future, I consider the five *Furgatch* factors: the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the extent to which the defendant's professional and personal characteristics might enable or tempt him to commit future violations; and the sincerity of any assurances against future violations." *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 n.5 (9th Cir. 1989); *see also Index*, 977 F.3d at 826 n.3 (noting that the district court applied the five *Furgatch* factors to determine that the defendants' conduct was likely to continue). Here, four of the five factors counsel that the conduct is likely to continue, thereby conferring standing on Cavalaro.

First, Metro acted with scienter because the conduct at issue was intentional. Officers shot Cavalaro in the back with a pepperball (and dozens of them at her feet) as she was following their command to leave, pursued her down on the sidewalk as she continued to walk away as ordered, ziptied her hands behind her back, and arrested her pursuant to Metro's policy of ending

---

on the night of the ICE protest at issue here. Officers shot pepperballs at the feet of a non-threatening, kneeling photographer as he photographed their skirmish line. ECF No. 65-20 at 00:00:45. As he then retreated, an officer shot him in the back with a pepperball. *Id.* at 00:00:47. Elsewhere, another officer fired pepperballs across an intersection at the feet of retreating protestors. ECF No. 65-5 at 1:07:18. Each of these uses of force is similar to that deemed likely unreasonable in *Downes-Covington*. 2020 WL 7408725 at *9.

the protest after a dispersal order, regardless of location. *See Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012) ("The intentionality requirement is satisfied when the 'termination of freedom of movement [occurs] *through means intentionally applied.*'" (alteration and emphasis in original) (quotation omitted)). The infraction is a recurrent one, as Metro engaged in this same conduct against other protestors that night and engaged in similar conduct towards protestors before. *Cf. Downes-Covington*, 2020 WL 7408725 at *9 (engaging in similar conduct, *see* note 3, supra).

Metro does not appear to adequately recognize the wrongfulness of the officers' conduct. It subsequently updated its policy (as it did in *Downes-Covington*, *see id.* at *12 n.12), but its new policy allows retaliatory conduct based on First Amendment activity—the exact kind of which Cavalaro complains. The new policy states that, once a dispersal order has been issued, "[c]ontinued protest-related behavior (e.g., chanting, marching, . . .) constitutes non-compliance" sufficient to warrant arrest. ECF No. 99-2 at 9. In some scenarios, two protestors who act identically, but one chants and another does not, may be treated differently under Metro's new policy. Further, Metro argues that a different approach "would enable protestors to resume 'lawlessness after relocating' outside the so-called dispersal zone." ECF No. 98 at 2 (quotation omitted). This argument implicitly equates First Amendment protected expression with lawlessness. If true lawlessness resumed, officers could simply declare and enforce a different (or larger) dispersal zone. Lastly, Metro has not provided adequate assurances against future violations. Rather, as discussed, its new policy suggests that it may engage in the same conduct of First Amendment retaliation by equating First Amendment activity like chanting and marching with noncompliance with a dispersal order. Also as discussed, Metro modified its

pepperball usage policy in response to previous litigation and violated it anyway at the ICE protest that gave rise to this lawsuit.

Therefore, Cavalaro alleges First Amendment chilling that is based on more than a speculative fear of injury. This chilling was caused by both the arrest and Metro's pepperball deployment. This ongoing harm constitutes a cognizable injury sufficient to confer standing to seek injunctive relief from both acts, especially considering Cavalaro intends to attend future protests of a similar nature. *Index*, 977 F.3d at 826.

B. <u>I deny the dispersal order injunction because Cavalaro has not met her burden to show entitlement to a mandatory injunction and the injunction she requests is too broad and disconnected from the First Amendment violation she asserts.</u>

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) the balance of hardships favors the plaintiff, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party, the last two factors (equities and public interest) merge.'" *E. Bay Sanctuary Covenant v. Bide*n, 993 F.3d 640, 668 (9th Cir. 2021). Courts in this Circuit can apply a "sliding scale" approach, in which an injunction can be granted when there are "serious questions going to the merits" of the case, the balance of hardships tips "sharply toward the plaintiff," and the other *Winter* elements are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132–33 (9th Cir. 2011). Under either test, a "preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quotation omitted).

Injunctions that preserve the status quo are known as prohibitory injunctions. Injunctions that change the status quo and require a party to take affirmative action are known as "mandatory

injunctions," and the plaintiff's burden in seeking such an injunction "is doubly demanding." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). "Ordering a party to stop harmful conduct is one thing; compelling it to act affirmatively . . . is another." *San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025). When a plaintiff "seeks a mandatory injunction, she must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia*, 786 F.3d at 740 (emphasis in original).

Cavalaro's proposed dispersal order injunction is both mandatory and prohibitory. It is mandatory because it would require Metro to designate and communicate a specific dispersal area, which is affirmative conduct that Metro does not currently engage in and thus alters the status quo.[4] It is prohibitory because it would preclude Metro from making arrests for failure to disperse outside the designated area. The prohibitory portion is necessarily tied to the mandatory portion because if Metro does not have to designate and announce a specified dispersal area, then there is no area outside of which it can reliably be prohibited from making arrests. Cavalaro's requested relief related to the dispersal order is thus more mandatory than prohibitory, so she must show that the law and facts clearly favor her.

To establish a First Amendment retaliation claim under § 1983, "a plaintiff must prove: (1) [s]he engaged in constitutionally protected activity; (2) as a result, [s]he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Ballentine v. Tucker*, 28 F.4th 54, 61

---

[4] It is undisputed that Metro does not currently designated a dispersal area or communicate definitive dispersal area boundaries to protestors.

(9th Cir. 2022) (quotation omitted). As to the causation element, a plaintiff asserting a claim for a retaliatory arrest typically must demonstrate that the arresting officer lacked probable cause "because the presence of probable cause generally speaks to the objective reasonableness of an arrest and suggests that the officer's animus is not what caused the arrest." *Id.* at 62 (quotation omitted).

But even where the officer had probable cause, a plaintiff can prevail on a First Amendment retaliatory arrest claim if she "presents objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* (quotation omitted). The plaintiff also "must show that the retaliation was a substantial or motivating factor behind the arrest, and, if that showing is made, the defendant can prevail only by showing that the arrest would have been initiated without respect to retaliation." *Id.* at 63 (simplified). Whether First Amendment activity was a substantial or motivating factor for the arrest can be proved "with either direct or circumstantial evidence," and involves factual questions "that normally should be left for trial." *Index*, 977 F.3d at 827.

Cavalaro seeks an injunction against Metro, not the individual officers who pepperballed and arrested her. So she must also establish municipal liability such that it would be appropriate to enjoin Metro. She may seek injunctive relief against an entity like Metro under *Monell v. Department of Social Services*[5] if she establishes the underlying constitutional violation was the result of "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

[5] 436 U.S. 658 (1978).

I assume for purposes of this order that Cavalaro has met her burden to show a likelihood of success on the merits of her claim that the officers lacked probable cause to arrest her, that they pepperballed and arrested her in retaliation for her speech, and that they did so based on a pervasive practice or custom at Metro. She has met her burden to show irreparable harm because she states, under penalty of perjury, that her First Amendment rights have been chilled due to her fear that she will be subjected to similar conduct at future protests that she wants to attend. *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1190 (9th Cir. 2026) (stating that "a chilling effect" on the exercise of First Amendment rights "for even minimal periods of time, unquestionably constitutes irreparable injury") (quotation omitted).

But a likelihood of success on the merits of her damages claims does not automatically mean she has a likelihood of success on her claim for injunctive relief. Cavalaro seeks a broad mandatory injunction. Under *Trump v. CASA, Inc.*, a federal district court may not issue so-called "universal injunctions," and instead must afford only "complete relief between the parties" that are before the court. 606 U.S. 831, 837, 851 (2025) (emphasis removed). "While party-specific injunctions sometimes advantage nonparties, they do so only incidentally." *Id.* at 851 (simplified). "As a matter of law, the injunction's protection extends only to the suing plaintiff—as evidenced by the fact that only the plaintiff can enforce the judgment against the defendant." *Id.* at 852.

The Ninth Circuit recently reaffirmed this principle in *Los Angeles Press Club v. Noem*. There, the court vacated an injunction that prohibited the defendants from firing tear gas canisters or flash-bang grenades aimed at striking "any person." 171 F.4th at 1191. The injunction was overbroad because it was not limited to providing relief only to the individual plaintiffs and non-parties whose protection the plaintiffs showed to be necessary to afford

complete relief to the plaintiffs. *Id.* Similarly, in *Dickinson v. Trump*, the Ninth Circuit recently stayed a preliminary injunction enjoining "the government from using non-lethal crowd-control munitions unless someone poses an imminent threat of physical harm to law enforcement or other persons." 174 F.4th 634, 637 (9th Cir. 2026) (simplified). The court found the:

> injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility. That cannot be reconciled with *Trump v. CASA, Inc.*, . . . which reaffirmed that Article III courts lack equitable authority to grant "relief that extend[s] beyond the parties."

*Id.* at 645 (quoting *CASA*, 606 U.S. at 843).

Cavalaro's requested injunction is similarly overbroad. She requests that I (1) require Metro to identify a specific area that all protestors, not just Cavalaro, must leave; (2) communicate that area to all protestors, not just Cavalaro; and (3) not arrest anyone, not just Cavalaro, outside that designated and communicated area. Her proposed injunction is thus similar to those found invalid in *Dickinson* and *Los Angeles Press Club* because it would apply to non-parties. Cavallaro has neither argued nor shown that a broad injunction is necessary to afford her complete relief. *CASA* and its progeny make it very difficult for courts to enjoin even widespread and far-reaching police misconduct. I decline to enter an injunction that would have to be vacated by the Ninth Circuit.

Further, the requested dispersal order injunction is not sufficiently tied to Cavalaro's First Amendment retaliation claim. She asserts that she was pepperballed and arrested for her speech. Her injuries thus stem from that retaliation, not from the lack of a designated dispersal area. Nor do her injuries arise from a failure to communicate a dispersal order. The officer told her to "go that way," a functional equivalent of telling her to disperse. She followed that command but was

pepperballed and arrested anyway. Cavalaro has not shown how a specifically designated and communicated dispersal area would have changed the outcome.

Finally, the balance of hardships and public interest do not so clearly favor Cavalaro as to justify the extraordinary relief of the requested dispersal order injunction. Clearly, wrongful arrests and retaliation for the exercise of First Amendment rights are deplorable. On the other hand, the *Dickinson* court noted the many difficulties that a broad injunction related to crowd control raises, including the practical workability of injunctive provisions, the impact on law enforcement prerogatives, and potential dangers to officers and the public. 174 F.4th at 648–50. Many of those same concerns are in play here. There are strong arguments for and against injunctions that limit what police officers can do when trying to quell an unruly crowd. And *Trump v. CASA* severely limits my ability to grant broad relief that might be useful. Because Cavalaro has not met her burden to show she is entitled to the dispersal order injunction she seeks, I deny that portion of her motion.

C. I grant in part the pepperball injunction because Cavalaro satisfies the requirements for a preliminary injunction, but her requested relief is too broad.

Cavalaro's second requested injunction seeks to prohibit Metro from "[s]hooting pepperballs at any individual without evidence of a physical threat to an officer or other individual, or that the targeted individual is engaged in serious criminal behavior." ECF No. 65 at 48. This is a prohibitory injunction, as opposed to a mandatory one, because it would prohibit Metro from taking the affirmative act of pepperballing her. *See* 42 Am. Jur. 2d Injunctions § 5 (2017) (*quoted favorably by Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017)) ("An injunction is considered prohibitory when the thing complained of results from present and

continuing affirmative acts and the injunction merely orders the defendant to refrain from doing those acts.”).

1. Cavalaro has shown a likelihood of success on the merits of her First Amendment retaliation and Fourth Amendment excessive force claims.

Cavalaro’s request for this injunctive relief stems from her first claim, First Amendment Retaliation under 42 U.S.C. § 1983, and her third claim, excessive force under the Fourth Amendment and § 1983. ECF No. 52 at 14, 19, 31. Because she seeks to enjoin Metro, she must also demonstrate one of the four bases for *Monell* liability to succeed. *Horton by Horton*, 915 F.3d at 602–03.

Excessive force claims are analyzed under an objective reasonableness test. *Graham v. Connor*, 490 U.S. 386, 397 (1989). “[T]he question is whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them.” *Id.* In *Nelson v. City of Davis*, the Ninth Circuit held it to be clearly established “that firing projectiles, including pepperballs, in the direction of individuals suspected of, at most, minor crimes, who posed no threat to the officers or others, and who engaged in only passive resistance, was unreasonable.” 685 F.3d 867, 886 (9th Cir. 2012).

Here, Metro officers fired pepperballs in the direction of (and in at least one instance, at the body of) Cavalaro, who was suspected of no crime greater than failure to disperse, who posed no threat to officers or others, and who was complying with orders given to her by those officers. Specifically, she was commanded to disperse by being told “go that way.” She obeyed that command but was nevertheless shot with pepperballs (both at her feet and in her back) and arrested for failing to disperse. She has shown a likelihood that the use of force was excessive and retaliatory. Indeed, the officers did not shoot her, pursue her, or attempt to arrest her until

after she followed the command to "go that way" and called them "fucking fascists." For these reasons, she is likely to succeed on the merits of her claims.

These actions will likely be attributable to Metro as part of a "pervasive practice or custom." *Horton by Horton*, 915 F.3d at 602–03. Metro's practice of pepperballing non-threatening, retreating protestors occurred in prior protests and other situations on this same night. During a 2020 Black Lives Matter protest, Metro officers shot pepperballs at "retreating and seemingly compliant protestors," which "appear[ed] unreasonable in light of the minimal threat the protestors posed." *Downes-Covington*, 2020 WL 7408725 at *9. And during the 2025 ICE protest at which officers struck Cavalaro, Metro officers also fired pepperballs at several other retreating protestors. This included shooting pepperballs at the feet of a photographer who was kneeling to take pictures of the Metro skirmish line. ECF No. 65-20 at 00:00:40. As the photographer retreated, officers shot him directly in the back. *Id.* at 00:00:45. Officers' callous disregard for protestors' rights was illustrated by their own statements. For example, one officer loaded his pepperball gun with tens of rounds "while there's a lull in the action, baby." ECF No. 65-5 at 00:24:51. Once he finished loading, another officer told him "alright, have fun." *Id.* at 00:25:20. Approximately 40 minutes later, that officer fired those pepperballs across an empty intersection at protestors who were already running away from Metro's skirmish line. ECF No. 65-5 at 1:07:18. Taken together, these events likely establish a practice or custom sufficient to support a *Monell* claim. Because Cavalaro likely can establish both an underlying § 1983 claim and a Metro practice or custom to support *Monell* liability, she is likely to succeed on the merits of her claim against Metro.

/ / / /

/ / / /

2. <u>Cavalaro has shown a likelihood of irreparable harm absent injunctive relief</u>.

Cavalaro also stands to suffer irreparable harm in the absence of injunctive relief. She swears in her affidavit that Metro's pepperballing has caused an ongoing chilling of her First Amendment rights, as she has skipped protests and left others early due to fear and anxiety of facing similar uses of force. ECF No. 65-1 at 3-4. Cavalaro hopes to attend upcoming protests, but she will continue to be unable to fully participate. *Id.* Metro's conduct thus has an ongoing impact on her freedom of expression. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Having demonstrated the existence of a colorable First Amendment claim, plaintiffs can establish irreparable injury sufficient to merit the grant of injunctive relief." *Press Club*, 171 F.4th at 1190 (simplified). Thus, Cavalaro has sufficiently demonstrated irreparable injury.

3. <u>The balance of equities and public interest weigh in Cavalaro's favor with a limited injunction</u>.

Metro suffers little, if any, hardship if it is bound to follow its own self-imposed policies with respect to a single protestor. Conversely, the chilling of one's First Amendment rights constitutes a heavy burden upon a citizen who wishes to protest. I appreciate the weighty public interest in affording the police discretion to perform crowd-control measures in often uncertain, dangerous, and rapidly changing circumstances. But this gives way to the public interest in law enforcement respecting its own guidelines, combined with the enormous public value of civic participation free of physical retaliation by the government, especially when that retaliation is also excessive.

/ / / /

/ / / /

4. Cavalaro's proposed pepperball injunction is too broad, but I can impose a narrower injunction.

As discussed above, I cannot grant injunctive relief broader than necessary to afford Cavalaro complete relief. *See CASA*, 606 U.S. at 851 ("The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'") (emphasis in original) (quotation omitted). But here, a narrower form of injunctive relief based on Metro's own policies is appropriate. Therefore, I enjoin Metro and its officers from:

> deploying pepperball rounds as a kinetic energy projectile against Cavalaro unless she is engaged in assaultive conduct or presents an immediate threat to public safety. They are also prohibited from deploying pepperball rounds at Cavalaro in any manner inconsistent with Metro's current 2026 Protest Policy, section 3.535. All terms are defined as in Metro's 2026 Protest Policy.

I recognize that this language orders Metro to simply comply with its own policies. Nevertheless, that is appropriate given that Metro appears to have violated both its own policies and clearly established law. *See Nelson*, 685 F.3d at 886–87. Metro's policy on the date of the protest was to use aerosol irritants (including pepperballs) "only after clear warning has been given," and "to assist in the dispersal of the crowd when individuals pose a threat of harm to officers or another person; are actively attempting to loot, ransack, or destroy property; or attempting to take over or commandeer property where there is a threat to public safety, such as a freeway." ECF No. 99-1 at 8. Metro's then-policy also stated that "[f]orce will not be used on compliant subjects or on non-threatening people who are attempting to disperse." *Id.* Metro's conduct toward Cavalaro appears to have violated these policies. Thus, I find unpersuasive Metro's argument that its new policy revisions adequately protect Cavalaro, rendering injunctive relief unnecessary. So there is value in an injunction requiring Metro and its officers to comply with Metro's self-imposed guidelines, at least as they apply to the plaintiff before me. Because I

partially grant the motion for a preliminary injunction, I deny as moot Cavalaro's request for a temporary restraining order. ECF No. 62.

## III. Conclusion

I THEREFORE ORDER that plaintiff Kathleen Cavalaro's motion for preliminary injunction **(ECF No. 65)** is **GRANTED in part**. Defendant Las Vegas Metropolitan Police Department and its officers and employees are **ENJOINED** from deploying pepperball rounds as a kinetic energy projectile against Cavalaro unless she is engaged in assaultive conduct or presents an immediate threat to public safety. They are also prohibited from deploying pepperball rounds at Cavalaro in any manner inconsistent with Metro's current 2026 Protest Policy, section 3.535. All terms are defined as in Metro's 2026 Protest Policy.

I FURTHER ORDER that Cavalaro's motion for a temporary restraining order **(ECF No. 62)** is **DENIED** as moot.

DATED this 31st day of October, 2026.

ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE